UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID D. WRIGHT,

            Plaintiff,

            -v-

SUNHAM HOME FASHIONS, LLC,

            Defendant.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JAN 0 6 2014

11 Civ. 5271 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This diversity breach of contract action was filed on July 29, 2011. Plaintiff, a former employee of defendant, seeks payments under a termination agreement ("Termination Agreement") dated September 16, 2005. (Compl. ¶¶ 5-8, July 29, 2011, ECF No. 1.) Defendant asserts that it has been contractually relieved of any further payment obligation due to plaintiff's breaches of the Termination Agreement. (Ans. ¶ 18, Sept. 6, 2011, ECF No. 3.) Defendant has counterclaimed for repayment of the $60,000 already paid to payment under that agreement. (Id. ¶¶ 21-27.)

On July 10, 2013, the Court held a one-day bench trial in this matter. On September 6, 2013, the parties filed post-trial memoranda. (See ECF Nos. 58, 59.) This Opinion and Order constitutes this Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

Defendant employed plaintiff David Sunham from 1995 to September 16, 2005. (Trial Tr. ("Tr.") 15, 19.) He started as a receiving clerk and eventually

worked his way up to Vice President. (Tr. 15, 16, 50.) With each new position Sunham took, his job responsibilities increased. (Tr. 51.) At the time of his departure, Sunham's job responsibilities included overall operations, purchasing product from overseas, and sourcing new suppliers. (Tr. 16, 19.) By the time of his departure, plaintiff was the third most senior person – after the President, Jane Bognacki, and the owner and Chief Executive Officer, Howard Yung. (Tr. 17, 51, 130.)

Sunham is in the business of home bedding fashions – what is sometimes referred to as "top of bed." (Tr. 16, 126-27.) It manufactures and sells sheets, comforters, duvets, quilts and related bedding products to customers such as J.C. Penny's, Wal-Mart, Target, and Macy's. (Tr. 41.) Sunham's offices are located in New York and China. (Tr. 16.)

Plaintiff testified at trial and, generally, the Court found him credible.[1] He testified that he decided to leave Sunham due to the stress of the job, discomfort with what he perceived as a tax evasion scheme by Sunham's, as well as a desire to care for an elderly parent. (Tr. 19-20, 22.) Plaintiff believed that defendant's establishment of two overseas entities, J&J and Mohking, was done to assist in a scheme by Sunham to artificially inflate its costs and thereby reduce its U.S. tax obligations. (Tr. 20, 22.)

---

[1] The Court specifically finds that plaintiff lacked credibility with respect to testimony regarding what information he provided to JLA Home regarding Sunham for use in litigation. (See infra.)

2

Apart from plaintiff's own belief, no evidence was presented at trial that J&J and Mohking were in fact established for purposes of allowing defendant to engage in tax evasion.

At the time of plaintiff's termination, plaintiff and defendant entered into a written Termination Agreement. (Tr. 138-39.) Sunham believed it was important to have such an agreement in place since plaintiff was a key employee. (Id.) The agreement was negotiated between the parties, though plaintiff did not have a lawyer review it before he signed it. (Tr. 26, 29.) The agreement went through multiple drafts. (Tr. 139, 140.)

Plaintiff testified that he understood Sunham's CEO, Yung, was primarily concerned that plaintiff not work for a competitor. (Tr. 28, 72, 74.) In exchange for plaintiff providing a non-compete, as well as taking on certain additional obligations, defendant agreed to make monthly payments of $10,000 for 12 months and $7,000 for six months thereafter, for an aggregate payment of $162,000.

The key provisions of the Termination Agreement are as follows:

> 2. Payments. For and in consideration of the Executive's entering into this Termination Agreement and performing his obligations hereunder, the Company agrees to pay to the Executive the sum of [$162,000]. . . . Notwithstanding anything else stated herein, in the event the Executive breaches any of his representations, covenants, agreements or obligations contained herein (including but not limited to, his obligation under Section 6 hereof), in addition to any other remedies which the Company may have under this Agreement or otherwise, the Company shall no longer be required to make any payments to the Executive pursuant to this Section 2.

3

> 6. <u>Restrictive Covenants</u>. (a) The Executive Covenants that for a period of eighteen (18) months following the date herof ("the Restrictive Covenant Period"), he will not, at any time, directly or indirectly, whether individually or as a principal, officer, employee, partner, shareholder, member, manager, director, agent of, or consultant or independent contractor to, any entity:
> (i) engage or participate, anywhere in the United States of America, in a business which is competitive with, as of the date hereof, directly or indirectly, that of the Company . . .
> . . .
>
> The Executive acknowledges and agrees that the scope of each of the restrictions contained herein are reasonable and necessary to protect the legitimate business interest of the Company and that the enforcement hereof would not prevent the Executive from earning a livelihood . . .
>
> (b) The Executive acknowledges that the Company and/or its subsidiaries have developed unique skills, concepts, sales presentations, marketing programs, marketing strategy, business practices, methods of operation . . . proprietary information [and] . . . financial and other confidential and proprietary information concerning its operations and expansion plans ("Trade Secrets"). The Executive agrees and covenants that, except with the prior written consent of the Company, the Executive shall not, directly or indirectly, use for the Executive's own benefit or for the benefit of another, or disclose . . . any Trade Secret . . . of the Company . . . .

(PX 1.)

On February 6, 2006, plaintiff became the Chief Operating Officer ("COO") of JLA Home Fabrics. (Tr. 33; PX 2.) This was within the 18 month non-compete period set forth in the Termination Agreement. As JLA Home Fabric's COO, plaintiff was responsible for the operations of the business, sourcing of product, warehousing, and distribution. (Tr. 40.)

4

JLA Home Fabrics was in the business of selling manufactured fabrics for furniture upholstery. (Tr. 40.) The fabric acquired by JLA Home Fabrics was not primarily used for "top of bed" products, but was rather used as furniture coverings for chairs, couches, and the like. (Tr. 40.) Sunham's Chief Financial and Chief Operating Officer, Arthur Courbanou, testified credibly that in limited instances Sunham sold not only "top of bed" products but upholstery as well. (Tr. 126-27.) The limited sales of upholstery made by Sunham were direct to sellers such as QVC and the Home Shopping Network, not to furniture manufacturers. (Tr. 143.) In general, JLA Home Fabrics had a different customer base from that of Sunham – selling to furniture manufacturers such as La-Z-Boy and Thomasville. (Tr. 41.) JLA Home Fabrics did not sell to JC Penny's, Wal-Mart, Target, or Macy's (as Sunham did). (Tr. 41.)

JLA Home Fabrics is owned by Edmund Jin, who is also the Chief Executive Officer of the company. (Tr. 33, 77.) Jin also owns an affiliated company, JLA Home. (Tr. 77, 84.) JLA Home is a direct competitor of Sunham. (Tr. 34-35, 76.) A provision of plaintiff's employment agreement with JLA Home Fabrics stated that he would have no duties or responsibilities for JLA Home.[2] (PX 2 ¶ 1; Tr. 36.)

During the time that plaintiff was employed by JLA Home Fabrics, it had six employees. (Tr. 35.) JLA Home Fabrics and JLA Home shared critical infrastructure and were inter-connected in the following ways:

---

[2] The employment agreement refers to this entity as JLA Home Fashions. (PX 2 ¶ 1.)

5

1. Jin was the head of both JLA Home Fabrics and JLA Home; (Tr. 33, 77, 84)

2. Plaintiff reported to, and had conversations relating to the business of JLA Home Fabrics with, Jin; (Tr. 88)

3. JLA Home and JLA Home Fabrics shared certain employees; (Tr. 87)

4. Lina Yi – an employee of both JLA Home and JLA Home Fabrics – executed plaintiff's employment agreement with JLA Home Fabrics; (Tr. 86-87)

5. Plaintiff's employment agreement with JLA Home Fabrics (PX 2) incorporated by reference the JLA Home employee manual, and certain terms and conditions of plaintiff's employment (including vacation policy and reimbursement of expenses) were dictated by the JLA Home employee manual; (Tr. 85-86)

6. JLA Home performed services for JLA Home Fabrics, including accounting services; JLA Home Fabrics disclosed its financial information to JLA Home in connection with JLA Home's provision of accounting services; (Tr. 78-79)

7. JLA Home provided JLA Home Fabrics with shipping services, and as a result of these services, JLA Home was aware of the identity of JLA Home Fabrics' customers; (Tr. 79-80)

8. JLA Home and JLA Home Fabrics share human resource services; (Tr. 80)

9. JLA Home and JLA Home Fabrics shared warehouse space; (Tr. 83)

10. JLA Home and JLA Home Fabrics each used part of the overseas offices of a company called TW Home, in which Jin was also a shareholder. (Tr. 80-82.)

Sunham ceased making payments to plaintiff in April 2006, when plaintiff began working for JLA Home Fabrics. (Tr. 105.) Plaintiff did not commence this lawsuit for five a half years.

Several events occurred during the intervening five years. At the end of 2007, more than a year after plaintiff had commenced work with JLA Home Fabrics, JLA Home commenced litigation against Sunham in California alleging unfair competition. (Tr. 94-95.) The complaint in that lawsuit reflects a variety of details regarding defendant's business. Plaintiff testified in a manner the Court found lacked credibility insofar as he stated he provided information regarding only a single paragraph of the factual allegations relating to Sunham's business practices: that Sunham's overseas agents charged a 15% mark-up on all purchases. (Tr. 98, 100.) The Court finds that it is more likely than not that additional factual allegations in the California lawsuit relating to Sunham's business practices came from plaintiff. Plaintiff conceded at trial that he was under no legal compulsion to reveal the information that even he concedes he revealed about Sunham and that was used for the California lawsuit. (Tr. 102-03.)

Plaintiff also disclosed information regarding defendant's business practices to the Internal Revenue Service in 2007. (Tr. 47-48.)

<u>CONCLUSIONS OF LAW</u>

7

Plaintiff alleges a single count of breach of contract. (See Compl. ¶¶ 8-9.) Defendant has counterclaimed for return of the $60,000 paid to plaintiff prior to the time that he became employed by JLA Home Fabrics. (Ans. ¶ 18.)

Basic principles of contract construction provide that agreements should be construed to effectuate the parties' intent. Gary Fredrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013) ("When interpreting a contract under New York law, the intention of the parties should control, and the best evidence of intent is the contract itself.") (internal quotation marks and citations omitted); Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y. 3d 624, 629, 859 N.E.2d 498 (2006). Unambiguous contracts should be construed according to their terms, without resort to extrinsic evidence. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458 (2d Cir. 2010) (citations omitted).

Here, neither party asserts that the Termination Agreement is ambiguous. Resolution of this case turns on twin factual questions: (1) whether JLA Home Fabrics was a direct or indirect competitor of Sunham, thereby relieving Sunham of its obligation to make any further payments to plaintiff, and (2) whether plaintiff separately disclosed Sunham's confidential information in 2007 – providing a second reason for ceasing payments.

The Court finds that the Termination Agreement clearly stated that plaintiff was prohibited for a period of 18 months from working directly or indirectly for a competitor. All parties agree that JLA Home is a competitor of Sunham. This Court finds that by working for JLA Home Fabrics, a company which shared a CEO

8

with JLA Home, and a company which shared certain important infrastructure with JLA Home, plaintiff breached the obligations under Section 6 of the Termination Agreement. This is further supported insofar as a shared employee, Lin, worked in finance for both companies, and that JLA Home Fabrics and JLA Home shared an employee manual.

In addition, the fact that plaintiff provided information regarding mark-up practices of Sunham to its competitor, JLA Home, must be viewed within the context that JLA Home had access to this information since plaintiff was the employee of an affiliated, indirect competitor.

Thus, the Court finds that as of the date that plaintiff commenced employment with JLA Home Fabrics, he was in breach of his Termination Agreement and Sunham had no further obligation to make payments under that agreement.

However, the Court also finds no basis for repayment of payments made. First, defendant has not alleged a breach of contract or unjust enrichment – nor could it. The counterclaim for repayment appears to be based in some equitable principle that since plaintiff did breach both the non-compete and later the confidentiality provision of the Termination Agreement, repayment is warranted. There is no basis in law for such an outcome without proper pleading and proof. If defendant believes, for instance, that it was damaged as a result of the disclosure of the confidential information, or by the breach of the non-compete, it could have

9

demonstrated actual damages suffered. In the absence of any such proof, there is no basis for a damages award.

## CONCLUSION

For the reasons set forth above, Judgment is entered for defendant on plaintiff's claim, and for plaintiff on defendant's counterclaim. Each party shall bear its own costs of the action. This constitutes the Order and Judgment of the Court.

The Clerk of the Court is directed to enter Judgment, with each party bearing its own costs, and to terminate this action.

SO ORDERED.

Dated:  New York, New York
        January 6, 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge